UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


DAVID S. JONES,              *    Case No. 16-CV-02194 (RML)
                             *
          Plaintiff,         *    Brooklyn, New York
                             *    October 11, 2018
     v.                      *
                             *
TREVOR TAHIEM SMITH, et al., *
                             *
          Defendants.        *
                             *
* * * * * * * * * * * * * * * *

      TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
           BEFORE THE HONORABLE ROBERT M. LEVY
             UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          JAMES A. MONTGOMERY, ESQ.
                            Law Office of James Montgomery
                            267 Fifth Avenue, Suite 810
                            New York, NY  10016


For the Defendants:         KEVIN M. BROWN, ESQ.
                            Mintz & Gold, LLP
                            600 Third Avenue, 25th Floor
                            New York, NY  10016




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 2:22 p.m.)

2          THE COURT:  Okay.  We are here on docket no. 16-CV-

3     2194, Jones versus Smith.

4          Will counsel please state their appearances for the

5     record.

6          MR. MONTGOMERY:  James Montgomery, appearing for the

7     plaintiff, Your Honor.

8          MR. BROWN:  Kevin Brown, of Mintz & Gold,  appearing

9     for the defendants.

10         THE COURT:  So we're here for a hearing.  And who

11    would like to call the first witness?

12         MR. BROWN:  We would call -- I guess defendants

13    would call Mr. Jones.

14         THE COURT:  Thank you.  Mr. Jones, would you mind

15    coming up here and sitting in the witness stand.  I promise

16    you it will be as comfortable as the seat you were in.

17         MR. JONES:  All right.

18         THE CLERK:  Would you please raise your right hand.

19           DAVID S. JONES, DEFENDANT'S SWORN

20         THE CLERK:  And please also state your full name.

21         THE WITNESS:  My name is David Jones.

22         THE CLERK:  Thank you.

23         THE WITNESS:  You're welcome.

24         THE COURT:  Your witness.

25         MR. BROWN:  Just do it right from here, Your Honor?

3

1          THE COURT:  Wherever you'd like.  You know, I

2     actually put that podium in the wrong spot there.  So if you

3     want to pull it back and put it over.

4                          DIRECT EXAMINATION

5     BY MR. BROWN:

6     Q     Good afternoon, Mr. Jones.  How are you today?

7     A     Good afternoon.  I'm quite well, thank you.

8     Q     And you understand we're at a hearing today about your

9     status as an employee or an independent contractor.  Do you

10    understand that, correct?

11    A     Yes.

12    Q     And there was a time when you drove for the artist known

13    as Busta Rhymes?

14    A     That's correct.

15    Q     And how long did you drive for him?

16    A     I would say approximately a year and a half.

17    Q     Are you familiar with an entity known as Divine Limo?

18    A     Yes, I am.

19          MR. BROWN:  May I approach, Your Honor?

20          THE COURT:  Yes.

21    BY MR. BROWN:

22    Q     I placed a document in front of you that's previously

23    been marked Defendant's Exhibit A.  Do you recognize that

24    document, Mr. Jones?

25    A     Yes, I do.

4

1   Q    And what is that document?

2   A    It is a certificate of incorporation.

3   Q    For Divine Limo?

4   A    Yeah.  For Divine Limo, yes.

5         MR. BROWN:  And we would move the admission of

6   Defendant's Exhibit A.

7         MR. MONTGOMERY:  No objection.

8         THE COURT:  Admitted.

9         (Defendant's Exhibit A received in evidence.)

10  BY MR. BROWN:

11  Q    When Mr. Rhymes paid you for your services as his driver,

12  he paid Divine Limo, correct?

13  A    Yes, that's correct.

14  Q    And that's a company you operate, right?

15  A    That's correct.

16  Q    And you set up by your sister, is that correct?

17  A    Yes.

18  Q    And Divine Limo was set up and incorporated so that you

19  personally could profit from working as a limo driver,

20  correct?

21  A    Yes.

22  Q    And Divine Limo was set up before you ever began working

23  for Busta Rhymes?

24  A    Yes.

25        THE COURT:  Could you establish a date for that?

```
1    BY MR. BROWN:

2    Q    Do you recall when Divine Limo was set up?

3    A    No, not at all.  That was several years ago.  I couldn't

4    even guess.  At least ten years ago I would say.

5    Q    At least ten years ago?

6    A    Yes.

7    Q    And when did you begin driving for Mr. Rhymes?

8    A    Approximately a year and a half ago.

9    Q    A year and a half ago.

10   A    Yes.

11   Q    And when did your employment with Mr. Rhymes terminate?

12   A    It's been a while.  So what is it 2018? 2017 probably.

13   Q    September 2017.

14   A    Yes.

15   Q    So Divine Limo was set up before let's say 2014?

16   A    Yes.

17   Q    At the time Divine Limo was set up, you were working for

18   another company, correct?

19   A    That's correct.

20   Q    Is that R&K Limo?

21   A    Yes, it was.

22   Q    And why was Divine Limo set up?

23   A    It was set up for the purpose of myself being

24   independently able to work and obtain money.  It was set up

25   for that.  That was the purpose.  I was trying to grow in a
```

6

1    business sense and my sisters were backing me.

2    Q    And Mr. Rhymes, he's not in the business of operating a

3    car service, correct?

4    A    No, he's not.

5    Q    He's a musical artist?

6    A    Yes, he is.

7    Q    So you were driving a limo for him or car for him, that

8    was something auxiliary to his main occupation, correct?

9    A    Yes, I would say so.

10   Q    And the compensation Mr. Rhymes provided to Divine Limo

11   for driving, for your driving for him, how was that reported

12   to the IRS?

13   A    Oh, I would -- I would have taxes taken out of the monies

14   that I earned from Mr. Rhymes.  And then I would file taxes

15   for the corporation with the government.

16   Q    I'm going to place a document in front of you that is

17   marked Defendant's Exhibit B.  Are you familiar with that

18   document?

19   A    Yes, I am.

20   Q    What is that document?

21   A    This is a tax preparation for 2015, a corporation tax

22   return.

23   Q    For Divine Limo?

24   A    For Divine Limo.

25   Q    And the income that you received from Mr. Rhymes for

1    driving for him, it was reported on Divine Limo's tax returns,

2    is that correct?

3    A    Yes.  Yes, it was.

4    Q    And did you also take deductions related to expenses you

5    incurred for driving Mr. Rhymes --

6    A    Yes, I did.

7    Q    -- on these tax returns?

8    A    Yes, I did.

9    Q    Were you the only person that Divine Limo paid to drive

10   Mr. Rhymes?

11   A    No.  I had several gentlemen that was working for me --

12   Q    That was --

13   A    -- that would substitute drive for me, yes.

14   Q    That was Mr. Edward?

15   A    Yes.

16   Q    And Mr. Skinner?

17   A    Yes.

18   Q    And when Mr. Edward or Mr. Skinner drove for Mr. Rhymes,

19   did that change the compensation for Divine Limo at all?

20   A    No, it did not.

21   Q    You would take the Divine Limo compensation and give a

22   portion of it to Mr. Skinner or Mr. Edward, is that correct?

23   A    That's correct.

24   Q    And was Mr. Rhymes the only customer of Divine Limo?

25   A    No, he was not.

1    Q    Are you familiar with an individual named Terrence Nash?

2    A    Yes.

3    Q    And you also drove for him at the same time you drove for

4    Busta Rhymes, is that correct?

5    A    Yes, that's correct.

6    Q    And, in fact, at the time that you were driving for Mr.

7    Rhymes, you were free to take on other additional customers if

8    you wanted to, correct?

9    A    Yes, that's correct.

10   Q    Mr. Rhymes didn't place any limitation on you driving for

11   other people, is that correct?

12   A    Yes.

13   Q    And after you stopped driving for Busta Rhymes, did you

14   file a claim for unemployment?

15   A    Yes, I did.

16        MR. BROWN:  I would move the admission of

17   Defendant's Exhibit B before I move on.

18        MR. MONTGOMERY:  No objection.

19        THE COURT:  Admitted.

20   (Defendant's Exhibit B received in evidence.)

21   BY MR. BROWN:

22   Q    I place a document in front of you marked Defendant's

23   Exhibit C.  Are you familiar with that document?

24   A    Yes, I am.

25   Q    Can you identify it, please?

1    A    It's an unemployment insurance monetary benefit

2    determination.

3    Q    This is the claim that you filed for unemployment?

4    A    Yes, it is.

5            MR. BROWN:  I would move the admission of

6    Defendant's Exhibit C.

7            MR. MONTGOMERY:  No objection.

8            THE COURT:  Admitted.

9        (Defendant's Exhibit C received in evidence.)

10   BY MR. BROWN:

11   Q    And who did you identify as your employer in your claim

12   for unemployment?

13   A    Divine Limo, Incorporation.

14   Q    So you viewed Divine Limo as your employer, not Busta

15   Rhymes, is that correct?

16   A    That's correct.

17           MR. BROWN:  I have nothing further.

18           THE WITNESS:  Very well.

19           THE COURT:  Any questions?

20           MR. MONTGOMERY:  I have no questions, Your Honor.

21           THE COURT:  I guess I have a few questions.  So

22   let's start with Exhibit C.

23           Could I see that, please.

24           THE WITNESS:  That would be the unemployment?

25           THE COURT:  Yeah.  Thank you.

1          THE WITNESS:  Okay.  Actually it's the rest of it.

2          THE COURT:  Okay.  Thanks.

3      (Pause.)

4          THE COURT:  So were you granted unemployment?

5          THE WITNESS:  Yes, sir, I was.

6          THE COURT:  And who paid that?

7          THE WITNESS:  It came out of Divine Limousine.

8          THE COURT:  It came out of Divine Limousine?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Thank you.  So when did you start

11  working for Mr. Rhymes?

12          THE WITNESS:  I don't have -- I don't have -- Your

13  Honor, I don't have the exact date, but since my daughter's

14  two, that would be 2016, probably around end of 2014, 2015.

15          THE COURT:  Okay.  How long did you -- how long did

16  you work for him?

17          THE WITNESS:  Approximately a year and a half, maybe

18  a little bit more.

19          THE COURT:  Did you have some kind of contractual

20  relationship with him?

21          THE WITNESS:  No.

22          THE COURT:  Did he -- how did you or he set your --

23  the payments you would receive from him?

24          THE WITNESS:  Well, he thought -- he decided how

25  much money that he would -- was going to pay me per year.

11

1          THE COURT:  Okay.

2          THE WITNESS:  And I agreed with that.

3          THE COURT:  Okay.  And how much was that?

4          THE WITNESS:  It was 100,000 a year.

5          THE COURT:  Okay.  And for that 100,000, did he

6    require you to work a certain number of hours or be available

7    a certain amount of time for him?

8          THE WITNESS:  It was as directed.  However long it

9    took for me to perform the service of driving him to and fro.

10         THE COURT:  Uh-huh.

11         THE WITNESS:  It was never mentioned how long that

12   particular day would take, how many hours of that day.

13         THE COURT:  So were you expected to be available

14   certain times for him?

15         THE WITNESS:  Yes.

16         THE COURT:  How did that work?

17         THE WITNESS:  Well, I would -- at the end of the

18   evening, initially we had -- he would tell me what time that

19   he needed me the following day.

20         THE COURT:  Okay.

21         THE WITNESS:  Then it was established that I would

22   be at the house at 2 o'clock in the afternoon every day and

23   just let him know that I was there, and then I'd wait for him

24   to come out.

25         THE COURT:  And how long did you typically have to

1    wait for him to come out?

2              THE WITNESS:  It depends, sir.  It could have been

3    an hour, half an hour.  It may have been three, four hours.

4              THE COURT:  And then how long did you work for him

5    during the day?

6              THE WITNESS:  Oh, that day would be -- sometimes it

7    would be quite extensive, 15 hours, 8 hours.

8              THE COURT:  And were you expected to be available

9    during that time, that whole time?

10             THE WITNESS:  Yes.

11             THE COURT:  Okay.  And were you expected to be --

12   you personally expected to be available --

13             THE WITNESS:  Sir, in the -- me being in this

14   profession for quite some time, I would, you know, adhere to

15   whatever needs that were necessary to, you know, everything

16   involved comfortable for him.  I was trained that way --

17             THE COURT:  Right.

18             THE WITNESS:  -- from the company, previous company.

19   So I had no qualms with -- about the times.

20             THE COURT:  Okay.  How many -- how often did you

21   drive as opposed to the other drivers for Divine?

22             THE WITNESS:  Oh, I was the main driver.  I would

23   drive mostly -- I would drive from 2:00 in the afternoon --

24   initially from 2:00 in the afternoon until 12:00 a.m.  And

25   then I would have one of my relief drivers come on and take

1    over from that time until he went home.

2            THE COURT:  And would that be every day or quite

3    often?

4            THE WITNESS:  That would be Monday through Friday.

5            THE COURT:  So how often did you need a relief

6    driver would you say?

7            THE WITNESS:  Initially it turned out to be I would

8    just work the five days up until 12:00 a.m.  And I would have

9    Mr. Skinner come in and relieve me.

10           THE COURT:  Okay.

11           THE WITNESS:  Yes.

12           THE COURT:  So initially, how long a period of time

13    would that be that you turned it over to -- the car over to

14    Mr. Skinner?

15           THE WITNESS:  Oh, how often did that happen?

16           THE COURT:  Yeah.  How often did that happen?

17           THE WITNESS:  Every night.

18           THE COURT:  Every night.

19           THE WITNESS:  Monday through Friday, yes, sir.

20           THE COURT:  Okay.  Was that through the entire

21    period of your employment?

22           THE WITNESS:  Often times it would change.  Maybe he

23    would be late and I was told to stay home.

24           THE COURT:  Okay.

25           THE WITNESS:  Yeah.

14

1          THE COURT:  But that was the standing arrangement?

2     That was --

3          THE WITNESS:  That was the standing arrangement.

4          THE COURT:  Okay.  And what about Mr. Edward, where

5     did he fit in?

6          THE WITNESS:  Mr. Skinner no longer wanted to work,

7     and he was tardy at times, so Mr. Edwards came in because he

8     was a colleague from the old company I used to work with.

9          THE COURT:  Okay.

10          THE WITNESS:  And I asked him to be a relief driver

11     for me.  That's how he came aboard.

12          THE COURT:  And how was he paid?

13          THE WITNESS:  He was paid through Divine Limo.  I

14     paid him.

15          THE COURT:  Okay.  How did you -- what kind of

16     arrangements did you make with Mr. Rhymes about relief

17     drivers?

18          THE WITNESS:  Oh, I would speak -- I had spoken to

19     him because he knows I have a family.

20          So I just -- we just had a verbal agreement that I

21     would only work until 12 a.m. and I would have a relief

22     driver.

23          I would be available for him on the weekends if

24     needed, if I couldn't obtain, you know, a weekend driver

25     couldn't show up.  But I would be the one that would primarily

15

1  drive him.

2          THE COURT:  Okay.  So how many hours a day would you

3  say you worked on average for Mr. Rhymes?

4          THE WITNESS:  A week?

5          THE COURT:  Well, just -- yeah, a week.  You could

6  start with a week, but then in a day.

7          THE WITNESS:  Oh, it would have been a 40 hour,

8  maybe 50 hour weeks. 50 hour weeks.

9          THE COURT:  Did he ever pay you overtime while you

10  were working for him?

11          THE WITNESS:  No.

12          THE COURT:  Did you ever discuss overtime with him?

13          THE WITNESS:  No, I did not.

14          THE COURT:  Did he ever give you a notice of your

15  rights as an employee?

16          THE WITNESS:  Yes.  I believe I signed one from his

17  attorney initially.

18          THE COURT:  Do you recall what that said or do you

19  have a copy of it?

20          THE WITNESS:  No, I don't.  I know it was a Homeland

21  Security paper, the tax papers, and I do believe it was

22  something pertaining to that.

23          THE COURT:  Do you recall the complaint in this

24  case?  Do you recall reading the complaint that you originally

25  filed in the case?

1          THE WITNESS:  Yes, I do.

2          THE COURT:  And did you read it carefully?

3          THE WITNESS:  Just kind of I skimmed through it.

4          THE COURT:  Okay.  Was it accurate though?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Is everything in the complaint

7     accurate as far as you know?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  Whose car did you drive when you

10    were driving Mr. Rhymes?

11         THE WITNESS:  His car, sir.  Mr. Rhymes' car.

12         THE COURT:  Did you only drive his cars?

13         THE WITNESS:  Yes.

14         THE COURT:  Okay.  Did he pay for gasoline, tolls,

15    expenses and other costs associated with driving him?

16         THE WITNESS:  Yes, he did.

17         THE COURT:  Was there any costs that you had to pay?

18         THE WITNESS:  No.

19         THE COURT:  Okay.  What about maintenance?

20         THE WITNESS:  He would pay for maintenance on his

21    vehicles.

22         THE COURT:  Now how did you -- how did you have

23    access to the car each day that you worked for him?

24         THE WITNESS:  Well, there's a parking lot right

25    adjacent to where he lives at, and I would just go to the

1     garage.  I would go into the lobby, let them know I was there,

2     and he would call down to the garage to have the vehicle

3     released.

4           THE COURT:  Okay.

5           THE WITNESS:  That's when I first came onboard.  And

6     as everyone became familiar with me, I would just get the key

7     and just go and get the car.

8           THE COURT:  So at the end of the day, did you return

9     the car with the keys?

10           THE WITNESS:  Yes, I did.

11           THE COURT:  And then each day you came back and --

12           THE WITNESS:  Yes.

13           THE COURT:  -- got the keys and the car again?

14           THE WITNESS:  Yes, that's correct.

15           THE COURT:  Okay.  Was it always the same car or was

16     it a different car?

17           THE WITNESS:  It was different vehicles.

18           THE COURT:  And who chose which vehicles?

19           THE WITNESS:  He would choose the vehicle.  Unless I

20     knew something was not working properly in a vehicle, then I

21     would just bring out the other vehicle.

22           THE COURT:  And do you know how he made the choice

23     as to which vehicle he was going to use?

24           THE WITNESS:  No, I did not.

25       (Pause.)

1            THE COURT:  So during the period of time you worked

2       for Mr. Rhymes, what percentage of your income did you derive

3       from him as opposed to driving for others?

4            The complaint says 90 percent, is that accurate or –

5       –

6            THE WITNESS:  Oh, 90 percent of my income?  Yes,

7       that's correct.

8            THE COURT:  Okay.

9            THE WITNESS:  Yes.

10           THE COURT:  And how many days a week were you

11      required to work?

12           THE WITNESS:  I was available for seven days.

13           THE COURT:  Seven days.

14           THE WITNESS:  Yeah.  But primarily I would just

15      drive for the five.

16           THE COURT:  Mm-hmm.

17           THE WITNESS:  Yeah.

18           THE COURT:  And being -- what does that mean to be

19      available?

20           THE WITNESS:  That if, in fact, I was needed if

21      someone didn't show up, or one of my relief drivers wouldn't

22      show up, then I would just step in and, you know, take all of

23      the care of the responsibility.

24           THE COURT:  Okay.  Did you ever work more than 14 or

25      15 hours a day?

19

1          THE WITNESS:  No.

2          THE COURT:  Did you ever work more than ten hours a

3    day?

4          THE WITNESS:  Yes.

5          THE COURT:  How often would you say?

6          THE WITNESS:  I would say that would have been about

7    70 percent of the time.

8          THE COURT:  70 percent?

9          THE WITNESS:  Yes.

10          THE COURT:  And more than eight hours a day?

11          THE WITNESS:  Yes.

12          THE COURT:  Again, 70 percent --

13          THE WITNESS:  The same, yes, 70 percent.

14          THE COURT:  Okay.  And again, you received no

15    overtime for that?

16          THE WITNESS:  No.  Did Mr. Rhymes say anything to

17    you about how he felt about other people driving him?  In

18    other words, did he expect you to drive him every day?  Or did

19    he -- or could you have sent someone else?

20          THE WITNESS:  Yeah.  Yeah, I could have sent someone

21    else.  He expected me to drive every day, but there wouldn't

22    have been an issue, if I had something to do, or some business

23    to take care of or a doctor's appointment, then there wouldn't

24    be an issue.

25          THE COURT:  Did that ever happen?

20

```
1                    THE WITNESS:  Yes, it has.
2                    THE COURT:  Okay.  So if I understand it correctly,
3       the rule was that you would drive him every day unless you had
4       a doctor's appointment or some other business to take care of?
5                    THE WITNESS:  Yes, sir.  That's correct.
6                    THE COURT:  And then after midnight, there would be
7       a relief driver if you were needed because you had a family to
8       take care of?
9                    THE WITNESS:  That's correct.  Well, the relief
10      driver was mandatory after midnight.  Then I would definitely
11      have a relief driver come in.
12                   THE COURT:  Okay.  And that was part of the
13      agreement you had with Mr. Rhymes?
14                   THE WITNESS:  Yes, sir.
15                   THE COURT:  So you said you drove for Mr. Rhymes
16      approximately 90 percent of the time.  Who else did you drive
17      for?
18                   THE WITNESS:  An artist -- his name is Terrence
19      Nash.  And he's a rhythm and blues artist.  And whenever he
20      would come to New York, I would -- I would drive him and I
21      would put a relief driver with Busta Rhymes.  He had no issue
22      with that.  But, yeah, that's who I used to drive.
23                   THE COURT:  How often would he come to New York?
24                   THE WITNESS:  Out of the year, perhaps anywhere from
25      12 to 15 times.
```

1          THE COURT:  Okay.  And did you know him

2      independently or did you know him through Mr. Rhymes?

3          THE WITNESS:  No, I knew him independently.

4          THE COURT:  So you have connections in the music

5      world?

6          THE WITNESS:  That's correct.

7          THE COURT:  Okay.  Are you a musician yourself?

8          THE WITNESS:  No, I'm not.

9          THE COURT:  You're just know some musicians?

10         THE WITNESS:  Yes.

11         THE COURT:  Was there anybody else you drove for

12     besides him?

13         THE WITNESS:  Yes.  During the time of --

14         THE COURT:  During that time, yes.

15         THE WITNESS:  Yes.  I drove Colin Powell.

16         THE COURT:  How did that come about?

17         THE WITNESS:  They had some kind of event at the --

18     for the NAACP.  Yeah.

19         THE COURT:  And how did you -- did you know Colin

20     Powell?

21         THE WITNESS:  No, I didn't know him.  Actually, the

22     company I previously worked for, R&K Limousine, some kind of

23     way they had gotten the business for driving all the

24     dignitaries for the event, and they called me up and asked me

25     would I do that.

1          THE COURT:  And you asked Mr. Rhymes if that was

2     okay?

3          THE WITNESS:  Well, I didn't tell him what I was

4     doing.  I just told him I had something to take care of.

5          THE COURT:  Okay.

6          THE WITNESS:  Yes.

7          THE COURT:  So did you drive for other musicians as

8     well or is that -- was that later?

9          THE WITNESS:  During the course of this --

10         THE COURT:  Your employment with Mr. Rhymes.

11         THE WITNESS:  No, that was it.  That was it.

12         THE COURT:  And then later you drove with others?

13         THE WITNESS:  Not while I was with Mr. Rhymes.

14         THE COURT:  Okay.

15         THE WITNESS:  Just Terrence Nash.

16         THE COURT:  And does Divine still exist?  Are you

17    still --

18         THE WITNESS:  On paper, it does.  I haven't shut it

19    down yet.  You know, I'm trying to -- just haven't gotten

20    around to it, but I don't use it any longer.

21         THE COURT:  When did you stop using it?

22         THE WITNESS:  Right after this incident with Mr.

23    Rhymes.

24         THE COURT:  And why --

25         THE WITNESS:  And that is, in fact, I actually used

1    the company when I started driving for Mr. Rhymes.

2              THE COURT:  Uh-huh.

3              THE WITNESS:  Yes.

4              THE COURT:  Then why did you stop using it?

5              THE WITNESS:  Well, I'm in a different profession

6    now.

7              THE COURT:  Oh.  May I ask what your profession is?

8              THE WITNESS:  We -- I work for New York Paving and

9    so we put down the new streets.  We're the guys that hold up

10   all the traffic in the morning.  That's us.

11             So I do a lot of excavating, excavation of the

12   street, like the milling machine will come by, rip up the

13   street, and then the backhoe will come, lift it up, dump it in

14   the dump truck.  Whatever's left, I'll shovel it into the

15   bucket.  And then after that, the machine cannot go over the

16   manhole.  So there's some little of the asphalt that's still

17   left, so I would jackhammer that out and clear that out so the

18   pavers could come through.

19             THE COURT:  So let me understand.  You're someone

20   who for a number of years made a living driving cars on roads

21   and didn't like it when the roads were all chopped up, and now

22   you're someone who makes a living doing the opposite?

23             THE WITNESS:  Yes, that's correct.

24             THE COURT:  Okay.  Just so I understand.

25             THE WITNESS:  I have a two year old now and -- a two

1    year old and an eight year old and I have to take care of

2    them.

3              THE COURT:  So you're not a driver anymore?

4              THE WITNESS:  No, I'm not.  No.

5              THE COURT:  So after you left Mr. Rhymes, was that

6    pretty much the end of your driving?

7              THE WITNESS:  Well, I still drove Mr. Nash for some

8    time and then that was it.  He sold his car and that was it.

9              THE COURT:  Okay.

10             THE WITNESS:  Yeah.

11             THE COURT:  So am I right then that you used Divine

12   only during the time that you worked for Mr. Rhymes?

13             THE WITNESS:  And Mr. Nash.

14             THE COURT:  And Mr. -- did you start working for Mr.

15   Nash before or after you worked for Mr. Rhymes?

16             THE WITNESS:  Actually, I was working for Mr. Nash

17   prior to Busta Rhymes.

18             THE COURT:  Okay.  And did you have -- and had

19   Divine been established when you started working for Mr. Nash?

20             THE WITNESS:  Actually, I had used -- yes, the

21   Divine Limo was established.  Yes, sir, it was.

22             THE COURT:  Okay.  And did you establish it

23   basically because you were working for Mr. Nash?

24             THE WITNESS:  No, I had established the company

25   years prior to that.  I just never used it.

25

1          THE COURT:  You just never used it?

2          THE WITNESS:  Yes.

3          THE COURT:  And you started -- and when was the

4     first time you started using it?

5          THE WITNESS:  I've been doing it so long, I really -

6     - I don't -- I can't give a date, but it was somewhere after

7     maybe 2010.

8          THE COURT:  And what made you start using it?  What

9     was the point of it?

10          THE WITNESS:  Previously I had -- when I worked R&K

11     Limousine, I was an independent contractor.  So I knew about

12     being responsible for having to have to pay taxes later on.

13          So my thought was that if I have them pay Divine

14     Limo, then I could set myself up where I could pay my Social

15     Security taxes and I can pay whatever taxes that were

16     necessary.

17          I wouldn't have to be holding to owing, you know,

18     with the 1099, because my experience was that you never get

19     around to paying it before you get the penalties and interest.

20     That was my position.

21          So I became more knowledgeable of that so I decided

22     to go through my company so that I would be able to collect

23     unemployment if something were to happen or -- you know, just

24     wanted to be more business sense, business wise.

25          THE COURT:  Did you consider yourself an independent

1    contractor when you worked for Divine?

2              THE WITNESS:  Yes.

3              THE COURT:  And tell me why that was.

4              THE WITNESS:  Because I had a thought that I was

5    separate from the company, you know.  Then I needed to get

6    paid, so, you know, that's how that was.  Yeah.  That's how

7    the --

8              THE COURT:  Did you consider it --

9              THE WITNESS:  I know it was separate from the

10   company itself.  Yes.

11             THE COURT:  From Divine itself?

12             THE WITNESS:  Yes.

13             THE COURT:  And did you consider you were working

14   for Mr. Rhymes or for Divine?

15             THE WITNESS:  For Divine Limousine.

16             THE COURT:  And that he had hired -- he had hired

17   Divine Limousine?

18             THE WITNESS:  Yes.

19             THE COURT:  Not you?

20             THE WITNESS:  That being because our relationship

21   goes way back.  He, in fact, came to my wedding.  He was in my

22   wedding.  And I got married in 2010.

23             But, yeah.  We had known each other.  I had driven

24   him before through R&K Limousine, the company I was

25   mentioning, so I knew him throughout the years.  And he would

1    ask me often times -- he would see me in the city -- come

2    drive for him.  I was no.  I'm okay where I'm at right now.

3                Eventually things got slow.  And Mr. Nash stopped

4    coming as often as he was to New York.  And I took him up on

5    his offer.

6                THE COURT:  And at that point, did you think you

7    were working for him or that he had hired Divine?

8                THE WITNESS:  No.  I knew that I was independently

9    driving.  I knew, you know, the difference.

10               THE COURT:  But you felt that you were working for

11   Divine and Divine was working for him?

12               THE WITNESS:  Yes.  I fully wanted that established.

13   You know.

14               THE COURT:  For what reason?

15               THE WITNESS:  Moving forward, I wanted to be able to

16   protect myself if I needed to get unemployment.  I needed to

17   protect myself for tax purposes, paying taxes.  That set up a

18   tax program, Quickbooks I believe it was.

19               THE COURT:  Okay.

20               THE WITNESS:  And, you know, I would pay them to do

21   my payroll and deduct the taxes, the estimation of taxes.  I

22   would quarterly pay them.  So I just wanted to be more

23   responsible in that.

24               THE COURT:  Anybody have any questions?  Any

25   followup?

28

```
 1              MR. MONTGOMERY:  No cross, Your Honor.

 2              MR. BROWN:  No questions, Your Honor.

 3              THE COURT:  Hold it one moment.

 4         (Pause.)

 5              THE COURT:  Sir, did you have to take off from work

 6    to come here today?

 7              THE WITNESS:  No, I didn't.  Actually it was a rain

 8    day.

 9              THE COURT:  Oh, because it was raining?

10              THE WITNESS:  Yes.

11              THE COURT:  Oh, good.  Oh, good.

12              THE WITNESS:  Initially I had put for that, but it

13    turned out, like, okay, good.  It didn't last the night we

14    worked until 8 o'clock.

15              So it was time and a half, so I actually worked five

16    hours overtime, so I actually got covered for today.  So I

17    felt really good.

18              THE COURT:  And you know your overtime rights now?

19              THE WITNESS:  I'm sorry?

20              THE COURT:  You know your rights now?

21              THE WITNESS:  Yes.

22              THE COURT:  Are you and Mr. Rhymes on good terms

23    these days or has this not been a good --

24              THE WITNESS:  No.  I haven't -- if I were to see

25    him, you know, salutations.  But I have no hard feelings, no
```

1    problems about anything.

2              THE COURT:  Let's go off the record for just a

3    second.

4         (Pause.)

5              MR. BROWN:  Thank you, Your Honor.

6              MR. MONTGOMERY:  Thank you.

7              THE WITNESS:  Okay.

8              THE CLERK:  You want to go back on the record?

9              THE COURT:  Yeah.  Go back on the record.

10             Thank you very much.

11             THE WITNESS:  We're good?  All right, Your Honor.

12             THE COURT:  Okay.  Good luck.

13             THE WITNESS:  Thank you.

14        (Proceedings concluded at 2:51 p.m.)

15             I, CHRISTINE FIORE, court-approved transcriber

16   and certified electronic reporter and transcriber, certify

17   that the foregoing is a correct transcript from the official

18   electronic sound recording of the proceedings in the above-

19   entitled matter.

20

21   *Christine Fiore*

22   _____        October 17, 2018

23   Christine Fiore, CERT

24

25

30

1                                    <u>INDEX</u>

2

3

4     WITNESS FOR THE              <u>DIRECT</u>   <u>CROSS</u>

5      <u>DEFENDANT</u>:

6     David Jones                     3      --

7

8

9     <u>DEFENDANT EXHIBITS</u>:               <u>Marked</u>    <u>Received</u>

10

11    A  Divine Limo Certificate          --          4

12       of Incorporation

13

14    B  Divine Limo 2015 Corporate       --          8

15       Tax Return

16

17    C  David Jones Unemployment         --          9

18       Benefit Determination

19

20

21

22

23

24

25